AK Steel Corp, Bethlehem Steel Corp, Inland Steel Co., Inc., LTV Steel Co., Inc., and U.S. Steel Group A Unit of USX Corp, plaintiffs *v.* United States, defendant, and Dofasco, Inc., Sorevco, Inc., Stelco, Inc., and Continuous Colour Coat, Ltd., defendant-intervenors

Court No. 96–05–01312

(Dated July 23, 1998)

*Skadden, Arps, Slate, Meagher & Flom LLP, (Robert E. Lighthizer and John J. Mangan)* for plaintiffs.
*Frank W. Hunger,* Assistant Attorney General, *David M. Cohen,* Director, *Velta A. Melnbrencis,* Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, *Robert J. Heilferty,* Attorney-Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.
*Willkie Farr & Gallagher (Daniel L. Porter, Christopher Dunn,* and *Jacqueline A. Weisman),* for defendant-intervenor Continuous Colour Coat, Ltd.

## Opinion

Restani, *Judge:* Before the court are the United States Department of Commerce's ("Commerce") Redetermination Results Pursuant to Court Remand, *AK Steel Corp. v. United States,* Slip Op. 97–152, No. 96–05–01312, 1997 WL 728284 (Ct. Int'l Trade Nov. 14, 1997) [hereinafter *"Remand Results"*][1], on three issues: (1) ministerial errors in the calculation of Stelco's margin, (2) Dofasco's partial reversal of restructuring charges, and (3) Continuous Colour Coat, Ltd.'s ("CCC") post-sale price adjustments. Familiarity with the facts of this case are presumed.

## I. Discussion

### A. *Ministerial Errors in Stelco's Margin Calculation*

The court granted Commerce's request for remand to correct certain ministerial errors in Stelco's margin calculation. *AK Steel,* Slip Op. 97–152, at 3, 1997 WL 728284, at *1. As the parties do not contest these changes the court sustains Commerce's changes to Stelco's margin calculation.

### B. *Dofasco's Reversal Charges*

In *AK Steel,* plaintiffs challenged Commerce's inclusion of Dofasco's prior period reversals as credits to costs in its financial statements for 1993 and 1994. Slip Op. 97–152, at 5, 1997 WL 728284, at *2. In its remand instructions the court ordered Commerce to eliminate the credit

---

[1] Pursuant to the new antidumping and countervailing duty regulations, all remand determinations dated after May 16, 1997 will be available on the International Trade Administration website. *See Antidumping Duties and Countervailing Duties,* 62 Fed. Reg. 27,296, 27,330 (ITA 1997) (rules and regulations). The remand results in this case are available at http://www.ita.doc.gov/import_admin/records/remands/97–152.htm.

for reversals, "unless it can articulate a rational reason for abandoning its past practice." *Id.* at 32, 1997 WL 728284, at *10–11.

As a result, in the *Remand Results* Commerce eliminated the credit for the partial reversal of prior period charges from Dofasco's costs calculation.[2] *Remand Results*, at 10. The parties do not contest this portion of the *Remand Results*. Thus, the court sustains this determination.

## C. *CCC's Post-Invoicing Price Adjustments*

Before the court plaintiffs challenged Commerce's determination that CCC's post-invoicing price adjustment methodology for credit and debit notes allocated to multiple sales was acceptable. *AK Steel*, Slip Op. 97–152, at 58, 1997 WL 728284, at *19. The court found that neither Commerce nor the parties adequately supplied evidence as to whether CCC's price adjustments were sufficiently related and allocated to specific sales transactions. *Id.* at 58, 1997 WL 728284, at *19. The court instructed Commerce to:

> indicate where in the record the debits and credits noted are shown to be properly related either directly or through allocation to specific sales transactions. If Commerce determines an acceptable level of specificity has been achieved or may otherwise be overlooked because a few such adjustments were made to the "same customer" within a "limited period," Commerce shall indicate where this is factually supported in the record and why these facts are relevant.

*Id.* at 58–59, 1997 WL 728284, at *19 (citation omitted).

Of the twenty home market and U.S. sales examined by Commerce during verification, only four home market and zero U.S. sales involved post-invoicing adjustments. *Remand Results*, at 2–3. Commerce addressed each of these sales in its remand analysis.

## 1. *First and Second Home Market Sales*

Commerce found an acceptable level of price specificity in CCC's price adjustment methodology for the first and second home market sales. *Id.* at 3–5. According to Commerce, CCC adequately related the first and second home market sales to specific sales transactions and work-orders over which the notes were applied. *Id.* The parties do not contest Commerce's findings. The court sustains Commerce's findings on this issue.

## 2. *Third Home Market Sale*

In the third home market sale, CCC's credit note referenced one work-order. *Remand Results*, at 5. The work-order contained multiple invoices and CCC allocated the credit note to all transactions made pursuant to the work-order on a weighted average basis. *Id.*; *See CCC Sales Verification Exhibit 40a*, at 1–2. In their comments on the draft remand determination, plaintiffs alleged that CCC misapplied the credit note. *Remand Results*, at 5. They cited an internal complaint form which ref-

---

[2] In its review of Dofasco's margin calculation, Commerce also made corrections for ministerial errors it identified in the calculations of interest expenses, general and administrative expenses, and variable and total cost of manufacturing for model match purposes. *Remand Results*, at 10. These adjustments are not in dispute; thus, the court sustains Commerce's findings regarding Dofasco's final margin.

erenced the work-order about which the customer complained, and also referenced a coil number. *Id.* Of the invoices involved only two referenced the coil in question. *CCC Sales Verification Exhibit 40*, at 6–12. Petitioners argued that for the credit adjustment to be transaction-specific, only merchandise produced from this coil should be subject to the adjustment.

In the *Remand Results*, however, Commerce found the evidence on the record did not support plaintiffs' belief. *Remand Results*, at 5. The returned merchandise consisted of two skids, each assigned an individual number. *Id.* Information on the record indicates that the skids did not originate from the coil identified on the internal complaint form. *Id.* Rather, Commerce found that it was impossible to match the two returned skids to any specific coil. *Id.* Because of CCC's inability to match the returned merchandise to the coil identified on the internal complaint form, Commerce found that CCC's allocation of the credit note across sales made pursuant to the work-order identified on the form was sufficiently specific. *Id.* at 5–6.

Plaintiffs claim this information shows CCC did not use the most specific methodology possible. According to plaintiffs, the internal complaint form is the best evidence to use when allocating the note because it identifies a specific coil number. They aver that for the credit adjustment to be transaction specific, only transactions involving the coil number referenced in the internal complaint form should be subject to the adjustment. Therefore, they allege that CCC incorrectly applied the credit note to the invoices that were not specifically tied to the coil number.

Moreover, plaintiffs find fault with Commerce's reliance on the skid numbers because, according to plaintiffs, it is irrelevant that the skid numbers from the returned merchandise do not match any of the skid numbers noted on the invoices made pursuant to the work-order in question. This lack of correspondence, according to plaintiffs, does not indicate that the returned material did not originate from the referenced coil. Plaintiffs arrive at this conclusion by indicating that generally it is unlikely that the same skid is used to deliver and return the same material. According to plaintiffs, nothing in the record suggest that these were the same skids used by CCC to ship the merchandise; therefore, it is faulty reasoning to try to use the skids to link the merchandise with a specific coil number.

In the alternative, plaintiffs argue that even if the skid numbers could identify the merchandise, Commerce still erred because the two skid numbers do not correspond with any of the skid numbers that appear on the relevant invoices. This shows, according to plaintiffs, the merchandise identified by the skids could not have come from those invoices; therefore, no credit should have been allowed.

Finally, plaintiffs argue that the flaw in CCC's allocation methodology causes it to report all sales involved incorrectly. In particular, plaintiffs claim that the methodology used by CCC has an averaging effect on

prices, i.e., the transactions that did not involve the coil received price reductions when there was in fact no reduction in price, and the transaction that did involve the coil did not receive the full amount of the credit. According to plaintiffs, this distortion is not mitigated by the fact that the sales were all to the same customer and occurred over a limited period of time. Plaintiffs note that Commerce suggested in the *Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate from Canada*, 61 Fed. Reg. 13,815, 13,822 (Dep't Commerce 1996) (final results), that these factors eliminated the possibility of an averaging effect on prices, but that Commerce did not explain the relevance of these factors in the *Remand Results*. This, according to plaintiffs, bolsters their claim that the presence of such factors does not eliminate price distortion.

As a preliminary matter, the court notes the general rule that Commerce requires post-sale price adjustments to be accompanied by transaction-specific information. *See SKF USA Inc. v. United States*, Slip Op. 95–85, at 16–17, 1995 WL 283855, at *7–8 (Ct. Int'l Trade May 8, 1995). The court finds plaintiffs' arguments unpersuasive and agrees with Commerce that CCC's price adjustment methodology is acceptable under the circumstances for the third home market sale. As the data were inconclusive as to which invoices the note applies, CCC's allocation across all invoices provides an acceptable level of transaction specificity in this instance. Although CCC cannot directly tie the credit note to a single invoice, it can link the credit note to particular sales of in-scope merchandise made pursuant to a single work-order.

Based on the facts on the record, a more specific methodology was not possible. Contrary to plaintiffs' assertions, the record does not show definitively that the returned merchandise originated from only the referenced coil number. As the internal complaint form did not explicitly identify the invoice numbers of the returned material, CCC was precluded from allocating the credit to only two of the invoices made pursuant to the work-order. Moreover, it is possible, as CCC suggests, that the other coil numbers were inadvertently omitted from the complaint form for a number of different reasons.

Furthermore, plaintiffs misinterpret Commerce's use of the information regarding the skid numbers on the returned merchandise. Commerce indicates simply that the skid numbers from the returned merchandise do not match those used for delivery. This makes it more difficult to trace the returned merchandise to a specific invoice number, but does not indicate, as plaintiffs claim, that no credit should be allowed at all. Consequently, the court sustains Commerce's finding that CCC adequately related its post-sale credit adjustment to specific sales transactions, using the most specific methodology possible.

### 3. *Fourth Home Market Sale*

A debit note issued to a customer in the home market that did not reference a specific invoice or work-order is the subject of the fourth home

market sale. *Remand Results*, at 6; *See CCC Sales Verification Exhibit 43a*, at 1–2. Because the note did not identify a specific invoice or work-order, CCC allocated the note across all sales to that customer. *Remand Results*, at 6. Commerce notes that the allocation was only to the nine home market sales made to this one customer, which represents less than 0.5% of all home market sales. *Id.*

In the *Remand Results*, Commerce concluded that a more specific allocation was not feasible, and that CCC's methodology does not distort the normal value and in turn the dumping margin. *Id.* Commerce adds that:

> [e]ven if Commerce were to make an adverse inference and apply the full amount of the debit note to any of the nine home market sales made to this customer, the resulting effect on CCC's margin would be insignificant. For eight of the home market sales, there would be no distortive effect (and, in fact, for one of these sales, there is a slightly negative effect) on CCC's margin if the debit note was fully applied to any one of these sales. For the last home market sale, the full application of the debit note to that sale would result in a small increase in CCC's margin.

*Remand Results*, at 6. In Commerce's determination, it found no danger of an averaging effect on prices. *Id.* at 7.

Plaintiffs claim that relating the debit note on a customer-specific basis does not meet the transaction specific requirement. Also, they suggest that the record evidence contradicts Commerce's findings that there is no distortion. Plaintiffs indicate that when the full amount of the debit note is applied to one of the nine invoices, the margin increases. They claim that when the credit is applied to the eight other transactions similar distortions result, which cumulatively would have a significant affect on CCC's margin calculation.

The court does not find plaintiffs' argument persuasive. Commerce's calculations show that even if it made the adverse inference, the effect on CCC's margin would be insignificant. The plaintiffs rely on the slight increase for one sale to support their argument that the cumulative effect of other such distortions would be significant. Commerce's figures show, however, that no such cumulative effect will occur because the margin changes only when the debit note is applied to two of the seven sales. In fact, when applied to one of the two sales it results in a lowering of the dumping margin. *See CCC Analysis Memorandum for CIT Remand*, at 2. Hence, the worst case scenario that plaintiffs put forth is not convincing. The adjustment, although not invoice-specific, is sufficiently transaction-specific in light of the circumstances. Thus, the court upholds Commerce's acceptance of CCC's methodology for the fourth home market sale.

### 4. *Use of Best Information Available*

Lastly, plaintiffs contend that the use of best information available ("BIA") was warranted because the possibility of error is fifty percent. They arrive at this figure by indicating that in the four home market

sales with post-invoice adjustments that Commerce analyzed, CCC twice used what plaintiffs believe was an unacceptable methodology. Plaintiffs suggest this shows the entire sample may be reported incorrectly. Thus, they ask that the case be remanded to Commerce with instructions to apply partial BIA to those sales for which CCC reported post-sale debits or credits. Plaintiffs ask the court to direct Commerce to disallow all credits for home market sales and all debits for U.S. sales, and to apply the highest credit as BIA to all U.S. sales with credit adjustments.

The error rate that plaintiffs put forth, however, is incorrect. Only four home market sales and no U.S. sales contained post-invoicing adjustments out of the twenty U.S. and home market sales that Commerce verified. Thus, plaintiffs miscalculated the possibility of error for the entire sample by focusing only on those four sales.

Additionally, Commerce may use BIA only if the necessary information is not available on the record, if a party is uncooperative in some way with Commerce's requests for information, or when the party's submissions fail verification. *See* 19 U.S.C. § 1677e (1994). These events did not occur in this case, thus the use of BIA is not warranted. Accordingly, the court rejects plaintiffs' request that this court direct Commerce to use BIA in its analysis.

For the reasons stated above the *Remand Results* are sustained in their entirety.